IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| BLACK HILL HOLDINGS, LLC, a Utah limited liability company; BLACK HILL DEVELOPMENT, LLC, a Utah limited liability company; and JANLIL, LLC, a California limited liability company,<br><br>Plaintiffs,<br><br><br>vs.<br><br><br><br>CITY OF ST. GEORGE, a municipality of the State of Utah,<br><br>Defendant. | **ORDER AND MEMORANDUM DECISION DENYING IN PART AND GRANTING IN PART DEFENDANT'S MOTION FOR JUDGMENT ON THE PLEADINGS**<br><br>Case No. 2:24-cv-00106-TC-CM<br><br>Judge Tena Campbell<br><br>Magistrate Judge Cecilia M. Romero |

Before the court is the City of St. George's (the City) motion for judgment on the pleadings (ECF No. 33). For the reasons stated below, the court grants and denies that motion in part.

## BACKGROUND

This action arises from a 2023 development dispute and the City's denial or deferral of its consideration of the planned development proposal of Plaintiffs Black Hill Holdings, LLC; Black Hill Development LLC; and Janlil LLC (collectively, the Owners). The Owners hope to establish a neighborhood called the "Saddle Mesa Development," which would include 168

single-family homes across 96 acres of land (the Property) in St. George, Utah, atop a hilltop mesa known as Black Hill.

The Owners purchased the Property in 1963, intending to develop it.   Their Warranty Deed grants them three limited use easements for accessing and developing the Property for habitation.  (Compl. ¶ 14, ECF No. 1.)  The first easement surrounds the Property's perimeter, providing a twenty-foot-wide unrestricted easement (Drilling Easement) to be used to drill for water.  (Id.; see also Warranty Deed, Compl. Ex. A.)  The second easement (the Roadway Easement) is for a fifty-foot-wide right of way access road, to be used by anyone who enters or exits the Property for any reason.  (Id.)  There is currently a public access road that services the hilltop, cutting through City-owned land, which is about seven to twelve feet wide.  The third easement (the Utilities Easement) is of an undefined size and is to be used for installing and accessing utilities services, such as telephone, electric, water, and gas lines.  (Id.)

In 1986, the City enacted a regulation called the "Hillside Development Overlay Zone" (the Hillside Ordinance), now codified at § 10-13A-1 et seq. of the St. George City Code.  (See Compl. ¶ 17.)[1]  While the Hillside Ordinance has been amended several times over the last forty years, its purpose is to limit development density, promote safe development on the sloped hills surrounding the City, and set aesthetic design standards, like development setbacks from sloped ridgeline areas.  Since passing the Hillside Ordinance, the City has selectively approved several proposed hillside developments on the basis that they are "grandfathered" into less restrictive development rules.  (Id. ¶ 19.)

---

[1] See Hillside Ordinance, https://stgeorge.municipal.codes/Code/10-13A-1 (last accessed December 1, 2024).

Since the 1990s, the City has purchased at least twelve parcels of land on and around Black Hill, totaling approximately 364.8 acres.  (Id. ¶¶ 30–33.)  As a result, the City owns and controls almost all the land surrounding the Property, including the land through which the development's inhabitants and visitors would enter or exit the Property.  (Id.)  While much of the land around Black Hill, including the City-owned land, remains undeveloped, the City has engaged in its own development projects on the hilltops surrounding St. George, including a joint venture to develop a mixed-use development adjacent to the Property, which requires making cuts in the surrounding hillsides of Black Hill for access roads, trails, and utility lines.  (Id. ¶¶ 29–30.)  The City's joint venture development was exempted from the Hillside Ordinance. (Id. ¶ 29.)

In 2007, the Owners submitted their first written application for permission to develop the Property.  (Id. ¶ 22.)  During that period, the Owners met with representatives of the City, including the City's then-Mayor, who informed them that the City did not want the top of Black Hill to be developed.  (Id. ¶ 23.)  Because the Owners ultimately deferred their development plans, the City never issued a final decision on their 2007 application.  (Id. ¶¶ 24–25.)

On December 28, 2022, the Owners submitted a new Application for the Saddle Mesa Development.  (Id. ¶¶ 37–38.)  These Saddle Mesa Development plans primarily seek to develop the flat mesa on the top of the Property, rather than the sloped hillside.  Accordingly, the majority of the lots set for home development are on slopes graded 10% or less, with just a few areas on slopes nearing 20%.  (Id. ¶ 70.)

In early 2023, the Owners requested meetings with the City Council to discuss their pending Application, which City Council members initially refused to schedule, claiming they could not meet with the Owners while their Application was pending.  (Id. ¶¶ 41–42.)

Meanwhile, discussing the Application internally, City officials expressed pessimism that the City would ever approve the project.  For example, officials in the Water Technical Services division discussed how the City "staff was [just] going through the motions" on the Owners' requests, concluding that the City had failed to give the Owners "clear direction going forward." (May 23, 2023 Email, ECF No. 34-1.)  On May 24, 2023, the Owners met with the City Council and the now-Mayor about the proposed development.  (Id. ¶ 47.)  During the meeting, the Mayor expressed her preference, mirroring the former Mayor's 2007 comments, that the Property be kept as "open space."  (Id. ¶ 48.)

Several months later, City officials informed the Owners' engineer that the Owners needed to conduct a geotechnical study of the Property's soil before their Application could even be considered.  Geotechnical surveys involve "boring," drilling burr holes, in the land to investigate the physical properties of the foundation and determine whether development would stress the land's structural integrity.  (Id. ¶ 50.)  Complying with the request, the Owners engaged a geological engineer to evaluate next steps and eventually sent Carol Winner, a senior planner and Community Development Department Director for the City, a copy of their site plan, mapping the necessary drilling locations for the geotechnical study.  In the Owners' engineer's plans, fourteen of the drilling sites were located on the Owners' Black Hill Property while four sites were located on the City's land.  (Gilson Engineering Analysis, ECF No. 34-2.)  Implicitly accepting that some of the drilling needed to occur on City-owned land, in addition to the Owners' Property, Carol Winner informed the Owners that two of the proposed boring locations were in a "do not disturb location" that could not be accessed without an access easement from the City.  (Emails, ECF No. 34-3.)  She also informed the Owners that they would not be

permitted to drill on City property without an agreement that the City would indemnify them for any damage to City property.  (Id.)[2]

    To perform the drilling the City had requested, the Owners determined that they would need to employ a 33,000-pound drilling-rig truck, which could only gain access to Black Hill by driving over City-owned land on a road larger and sturdier than the existing City-owned access road.  (ECF No. 34-2; Compl. ¶ 52.)  Accordingly, to facilitate the geotechnical study and supplement its Application, the Owners sent the City a written request on October 3, 2023, asking for permission to cross City-owned property to do the work and seeking indemnification against any incidental damage caused by the drilling work, road expansion, and transportation of equipment across City-owned property.  (Id.)  The Owners also asked the City for permission to enlarge the road by sixteen feet and smooth its surface so that their engineer's drill rig could safely reach Black Hill.  (Id.)  The Owners explained that their geological engineer had determined the necessary drilling locations in accordance with the City engineers' advice, including the drilling sites that were located on City property.  (ECF No. 34-2.)

    On November 3, 2023, Carol Winner sent the Owners a letter addressing the Owners' requests related to geotechnical testing and providing generalized comments on the Owners' proposed development Application.  (Denial Letter, Compl. Ex. C.)  The Denial Letter did not

---

[2] Copies of this correspondence are appropriately considered in deciding this motion because the substance of the parties' conversations are incorporated by reference in the Complaint.  (E.g., Compl. ¶ 50); Smith v. United States, 561 F.3d 1090, 1098 (10th Cir. 2009) ("[When] evaluating a Rule 12(b)(6) motion to dismiss, courts may consider not only the complaint itself, but also attached exhibits . . . and documents incorporated into the complaint by reference."); Atlantic Richfield Co. v. Farm Credit Bank of Wichita, 226 F.3d 1138, 1160 (10th Cir. 2000) ("A motion for judgment on the pleadings under Rule 12(c) is treated as a motion to dismiss under rule 12(b)(6).").

.

dispute that: (1) the geotechnical testing needed to be performed, (2) the road would need to be enlarged, (3) the project entailed drilling, in part, on City-owned land, and (4) the Owners would need an indemnification agreement from the City to complete the work associated with the geotechnical survey.  Winner stated that "the City w[ould] not grant either access or indemnification [rights] for any work on City owned property."  (Id. ¶ 54.)  Although the City prohibited the Owners from drilling on City land and refused to indemnify them for any damage caused to the City's property, the Denial Letter did not bar the Owners from drilling on their own Property, nor did it clearly grant or deny the Owners' request to cross the City's land for drilling on the Owners' Property.  (Id.)  The Denial Letter also stated that no grading or earthwork within the roadway could be approved without the Owners first obtaining a grading permit.  (Id.)

The City's Denial Letter had an attached document entitled "Saddle Mesa Comments from City Departments," compiling comments on the Owners' pending Application from staff across several City departments.  (Id. ¶ 53; see also Saddle Mesa Comments, Compl. Ex. D.)  In this document, the City addressed an unresolved issue for the development: the number of entry/exit access roadways to the Property.  (Compl. ¶ 57; see also Saddle Mesa Comments at § D.)

Because of the number of houses planned for the development, the City had previously directed the Owners to include at least two entry/exit roadways so that the neighborhood would comply with St. George fire and emergency services codes.  (Compl. ¶ 60; Saddle Mesa Comments at §§ D, E.)  In their Application, the Owners had indicated that they sought to use their Warranty Deed's Roadway Easement for the first entry/exit road and their Utilities Easement for the second entry/exit roadway.  (Id.)  The City clarified in its Denial Letter that the Owners would not be permitted to use their Utilities Easement for a general access road to the

Property and that it would not provide the Owners with any additional roadway easements beyond the single Roadway Easement outlined in the Warranty Deed.  (Id.)  The City reasoned that the Warranty Deed's Utilities Easement could only be used to run and perform maintenance on utility lines, but not for a general use roadway, and further indicated that the roadway the Owners planned to use to gain access to their proposed utility lines would be too steep to drive on.  (See Compl. ¶ 57; Saddle Mesa Comments at § A(2).)  Nonetheless, the City provided the Owners another option, informing them that including just one entrance to the development would accord with fire safety protocols so long as each home was equipped with appropriate sprinkler systems.  (Saddle Mesa Comments at § D.)

In the Saddle Mesa Comments, the City also determined that the development plans violate aesthetic and safety components of the Hillside Ordinance because (1) the proposed 100 foot set back "does not seem adequate to minimize the visual and aesthetic impact of development on the top of the hill for the remainder of the community"; (2) widening the access road violates the Hillside Ordinance; (3) the public road to the development would violate the street grade ordinance; (4) the utility and emergency access would violate the Hillside Ordinance; and (5) the import fill and wall requirements for the proposed roadway would violate the City Code.  (Id. ¶ 64.)  The City concluded its commentary by suggesting that the Owners supply "necessary information required for any permits" and "show that the project complies" with City Code, the Hillside Ordinance, "[i]f [they] would like to move forward with the project …." (Id. ¶ 56.)  The City deemed the Owners' Application "incomplete" because "it does not currently comply with the City Code provisions and it appears that the current proposed site plan and submission information will need to be modified to address the comments." (Id. ¶ 62.)

**LEGAL STANDARD**

A motion for judgment on the pleadings is reviewed under the same standard as a motion to dismiss under Rule 12(b)(6).  See Aspenwood Inv. Co. v. Marinez, 355 F.3d 1256, 1259 (10th Cir. 2004).  To survive a motion for judgment on the pleadings, the complaint must contain sufficient factual matter, accepted as true and interpreted in the light most favorable to the non-moving party, to state a claim to relief that is plausible on its face.  See Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009); Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007).  Additionally, the complaint must allege facts supporting all the elements necessary to establish an entitlement to relief under the legal theory proposed.  E.g., id.  Judgment on the pleadings should not be granted "unless the moving party has clearly established that no material issue of fact remains to be resolved and the party is entitled to judgment as a matter of law."  Id. (quoting United States v. Any & All Radio Station Transmission Equip., 207 F.3d 458, 462 (8th Cir. 2000)); see also Thomas v. Smith, No. 2:21-cv-210-DBP, 2022 WL 3017421, at *1 (D. Utah July 29, 2022) (same).  The court accepts "all facts pleaded by the non-moving party as true and grant[s] all reasonable inferences from the pleadings in favor of the same."  Park Univ. Enterprises, Inc. v. Am. Cas. Co. of Reading, Pa., 442 F.3d 1239, 1244 (10th Cir. 2006).

**ANALYSIS**

The Owners' § 1983 claims, brought under the Fifth Amendment's Takings Clause and the Equal Protection and Substantive Due Process provisions of the Fourteenth Amendment,[3] are based on the City's Denial Letter and Saddle Mesa Comments.  In their takings claim, the

---

[3] The Owners' Fourteenth Amendment "class of one" and substantive due process claims allege that the City has systematically denied them equal protection under the law by discriminately applying the Hillside Ordinance to their development but not to other similarly situated developers.  (Compl. ¶¶ 113–14.)

Owners allege that they need to (1) complete the geotechnical study—which necessarily involves drilling and road expansion on both their own Property and on City-owned land, and (2) use their Utilities Easement to build an access road to satisfy the City's multiple access road requirement. The Owners argue that the City's reasons for denying the Owners' Application—by denying the Owners the ability to address these threshold issues for development—are pretext for the City's preference to leave the area undeveloped, and that it would be futile for the Owners to amend their Application or scale back their plans because the City has already made up its mind to block development of any scope and maintain Black Hill as open space. (Pl's. Opp. Mot. Judgment on the Pleadings, ECF No. 34 at 5–10; Compl. ¶ 67.) The Owners therefore accuse the City of effectively "taking" their Property by blocking any economically beneficial development without compensating the Owners for its fair market value. (Compl. ¶¶ 82–98.)

The City seeks to dismiss the Owners' § 1983 claims on the basis that the City has not yet issued a final decision because the Owners' pending Application is "incomplete," requiring additional information and amendment to pass City zoning, aesthetic, and safety regulations—in other words, the City argues that the Owners still have a viable pathway forward and will not be barred from accessing and developing their Property upon amendment. (ECF No. 33 at 9–15; Def's. Reply Mot. Judgment on the Pleadings, ECF No. 35 at 2–3.) The City maintains that the Owners therefore lack prudential standing to challenge the City's Community Development Department's interim guidance, meaning the court lacks jurisdiction over the Owners' takings, "class of one," and substantive due process claims. Alternatively, the City argues that the Owners have no right to perform work on City-owned property and therefore have not adequately stated a takings claim based on the City's denial of their Application. If the Owners' federal constitutional claims are dismissed for lack of prudential standing, the City urges the

court to decline to exercise supplemental jurisdiction over the Owners' remaining state law claims.

## I.     Stating A Claim For Relief

### A.     Prudential Standing

"Standing jurisprudence contains two strands: Article III standing, which enforces the Constitution's case-or-controversy requirement, . . . and prudential standing[,] which embodies 'judicially self-imposed limits on the exercise of federal jurisdiction.'" The Wilderness Soc. v. Kane Cnty., 632 F.3d 1162, 1168 (10th Cir. 2011) (citing Elk Grove Unified Sch. Dist. v. Newdow, 542 U.S. 1, 11 (2004); Allen v. Wright, 468 U.S. 737, 751 (1984)).  The City does not dispute that the Owners have standing for their Fifth and Fourteenth Amendment claims sufficient to meet the Article III constitutional "case or controversy" requirement.  (See ECF No. 33 at 16.)  But the Owners must establish that they have prudential standing to bring their claims.[4] See Los Alamos Study Grp. v. U.S. Dep't of Energy, 692 F.3d 1057, 1064 (10th Cir. 2012).

For prudential standing, a plaintiff's claims must be "ripe" for adjudication—in other words, the Owners must establish that the City's decision to reject their Application is a "final decision."  The finality requirement ensures that property owners have suffered actual injury "and are not prematurely suing over a hypothetical harm." Pakdel v. Cty. & Cnty. of San Francisco, 594 U.S. 474, 478 (2021).  "Without such limitations—closely related to [Article] III concerns but essentially matters of judicial self-governance—the courts would be called upon to decide abstract questions of wide public significance even though other governmental

---

[4] The Court considers dismissal on the basis of prudential standing for each of the Owners' § 1983 claims because, as the Owners concede, the same ripeness doctrine applies to each of the Owners' § 1983 claims.  (E.g., ECF No. 34 at 3 n.1.)

institutions may be more competent to address the questions and even though judicial intervention may be unnecessary to protect individual rights." Id. at 500; see also The Wilderness Soc., 632 F.3d at 1168.

The Tenth Circuit has set forth standards for evaluating when a regulatory decision is "final." Pakdel, 594 U.S. at 477. Specifically, in one analogous case, N. Mill St., LLC v. City of Aspen, the Tenth Circuit examined the constitutionality of an Aspen city ordinance that removed permitted conditional use zoning for residential units and the city's subsequent refusal to rezone the plaintiff's property as a "mixed-use" district. 6 F.4th 1216, 1230 (10th Cir. 2021). The plaintiff developer, N. Mill St., LLC, sought to challenge the city's denial of their rezoning application but had not yet actually submitted a proposed development plan to the City. Id. In concluding that N. Mill St., LLC did not have prudential standing, the Tenth Circuit explained that a regulatory decision is not "final" if avenues still exist for the "government to clarify or change its decision"—in other words, a takings claim is prudentially ripe when "'the permissible uses of the property' are known to a reasonable degree of certainty." Id. at 1230 (quoting Palazzolo v. Rhode Island, 533 U.S. 606, 620 (2001)); see also Landmark Land Co. of Okla., Inc. v. Buchanan, 874 F.2d 717, 720 (10th Cir. 1989) ("A 'final decision' requires not only an initial rejection of a particular development proposal, but a definitive action by local authorities indicating with some specificity what level of development will be permitted on the property in question."), abrogated on other grounds by Fed. Lands Legal Consortium ex rel. Robart Est. v. United States, 195 F.3d 1190 (10th Cir. 1999). Accordingly, the Tenth Circuit determined that N. Mill St., LLC could not be "reasonably certain" of its permissible property uses because the city of Aspen would apply materially "more flexible standards" to evaluate development proposals rezoning request. Id. at 1233–34; see also id. at 1222 (explaining that the planned

development review process can permit site specific development plans warranting deviation from standard zoning rules). In other words, the Tenth Circuit found the claims were not ripe because there was a chance that N. Mill St., LLC's development plans would be approved despite the new Aspen zoning ordinance.

But to establish finality, plaintiffs challenging government takings need not pursue every single administrative avenue before they can adequately state a claim and establish their prudential standing. Instead, courts recognize that finality is an elastic concept evaluated on a case-by-case basis. For this reason, the Tenth Circuit has established a "futility doctrine" as a part of or exception to the "finality" requirement, ensuring that government decisionmakers do not require administrative exhaustion where their approval of a development plan has already effectively been foreclosed. See id. at 1230 (explaining that the finality requirement does not require landowners to exhaust administrative procedures, or to "submit applications for their own sake" if the government is "committed to a position" and the "pursuit of further administrative relief would be futile"). A plaintiff's "best support for a claim of futility is completion of the . . . unsuccessful pursuit of either a variance or a proposal for less intense development." Id. (citing Landmark Land Co. of Okla., Inc., 874 F.2d at 722). Evaluating the Owners' prudential standing therefore requires the court conduct a fact-based inquiry into the Owners' allegations surrounding their Application and the City's response.

Accepting the Complaint's allegations as true for purposes of this motion, the court finds that the Owners' development proposal would be denied without a completed geotechnical study, regardless of whether the Owners can amend other aspects of their proposal to comply with the Hillside Ordinance, the City's aesthetic preferences, and the secondary roadway requirement. (See ECF No. 33 at 13 (admitting that "such testing is required to complete the

application and allow the Planning Commission to rule on the proposed development").)

Accordingly, based on the City's November 3, 2024 Denial Letter and the Saddle Mesa

Comments, the court can reasonably infer that amendment of the Owners' Application would be

a futile exercise, meaning that the City's Denial Letter constitutes a "final" decision denying any

form of development.  The City has required the Owners to complete this study, which

necessarily entails (1) drilling on both the Owners' Black Hill Property and City property;[5] (2)

enlarging City roads to obtain access to drilling areas; (3) and obtaining an indemnification

agreement from the City to drill on and enlarge the road on the City's property.  The City claims

that it will permit the Owners the ability to cross City land (ECF No. 35 at 8), but does not

dispute that each of these above listed additional steps, which it has blocked without any form of

recourse, are essential to complete the geotechnical study the City has ordered—particularly

obtaining the City's approval to enlarge the road, without which the Owners cannot drill on their

own land, let alone the City's land.  By denying the Owners the ability to do work that needs to

be done pursuant to the City's own mandates, the City has "dug in its heels" on a threshold and

controlling issue.  N. Mill St., LLC, 6 F.4th at 1231 (citing Murphy v. New Milford Zoning

Comm'n, 402 F.3d 342, 349 (2d Cir. 2005)).

The court acknowledges that the Tenth Circuit typically requires that developers submit

at least one "variance" proposal before they can claim that the government's denial of a proposed

development application constitutes a "finalized" taking.  See id. at 1233 n.18 ("The

---

[5] At hearing on the motion, the City claimed that the Owners could conduct the geotechnical survey by drilling only on their own Property.  But the court finds this argument must be supported by facts and expert testimony outside the court's consideration on this motion.  In any event, the court can discern no commonsense reason why the Owners would have undertaken the burden of requesting to test City land were it not a scientifically necessary step in evaluating the structural integrity of the Owners' land.  Accepting the well-pled facts as true, the court must infer that the survey cannot be completed without drilling some holes on City land.

'unsuccessful pursuit of either a variance or a proposal for less intense development' is evidence of finality.") (citing <u>Landmark Land Co. of Okla., Inc.</u>, 874 F.2d at 722).  But the factual circumstances here indicate that no proposed "variance" could change the City's mind.  Even if the Owners fix or elaborate on other aspects of their proposal to comply with the Hillside Ordinance, the Owners still could not develop their land because there is no way for the Owners to complete the geotechnical study without conducting some drilling on City land.[6]  Nor is it apparent that reducing the scale of the development will obviate the Owners' need to conduct the drilling and road expansion projects.  As a result, the court cannot grant judgment for the City based on the Owners' failure to pursue "either a variance or a proposal for less intense development."  <u>N. Mill St., LLC</u>, 6 F.4th at 1233.

Indeed, this court's inference that the City has made a "final" decision and "dug in its heels" through issuing its Denial Letter is further supported by the Owners' well-pled allegations that the St. George Mayor and other city officials intend to block the project no matter the Owners' plans.  Specifically, the Owners allege that the current mayor told the Owners that she wanted to see the hilltop remain undeveloped, mirroring the sentiments shared by the former mayor when the Owners first tried to develop the land in 2007.  Likewise, the City's initial months-long refusal to meet with the Owners to discuss their pending Application suggests that the City was not willing to work together with the Owners to find acceptable solutions.  Accepting the Complaint's allegations as true, allegations showing the City's prejudice against the project strengthens the court's inference that the City has already finalized its decision to deny the Owners any development on their Property.  <u>See</u> <u>Palazzolo</u>, 533 U.S. at 620.[7]

---

[6] <u>See</u> <u>supra</u> n.5.

[7] The court does not, on this motion for judgment on the pleadings, consider additional evidence of prejudice which was neither attached nor referred to in the Complaint.  (<u>E.g.</u>, ECF No. 34-1.)

The court also rejects the City's new argument disputing the Owners' prudential standing, in which the City claims that the Denial Letter is a non-final "interim" decision because it was issued by the City's Community Development Department—the administrative body that will eventually recommend whether the Application should be approved—and not by the City Planning Commission or City Counsel, the departments that serve as the ultimate City decisionmakers.  The court disregards this argument principally because it relies on facts outside the Complaint regarding City government hierarchies and was inappropriately raised for the first time at the hearing on the City's motion.  See, e.g., Nard v. City Of Oklahoma City, 153 F. App'x 529, 534 n.4 (10th Cir. 2005) (explaining that courts do not consider "facts outside the complaint" in ruling on a Rule 12(b)(6) motion to dismiss); United States v. Malone, 10 F.4th 1120, 1124–25 (10th Cir. 2021) (The court will not entertain argument inappropriately raised "for the first time at oral argument."); compare with N. Mill St., LLC, 6 F.4th at 1222–23, 1231–34  (finding the city's "planned development" review was meaningfully distinct from its "zoning variance" review process by relying on facts in the record demonstrating the differences between these two governmental bodies' decision-making).  The City cannot now hide behind its internal departmental structures—on which the Complaint is silent—to evade responsibility for its decision.[8]

In addition to being untimely, the City's new argument contradicts its prior arguments in briefing as well as the text of the Denial Letter, both of which represent the Denial Letter as constituting or reflecting the City's decision.  Specifically, the City's motion represents the

---

[8] And even if the court were to convert this motion for judgment on the pleadings to one for summary judgment, considering facts outside the complaint, the evidence, as discussed below, shows (or at the very least raises a genuine issue of fact) that the Denial Letter and Saddle Mesa Comments constitute the City's decision.

Community Development Department as an arm of the City.  (See, e.g., ECF No. 33 at 2 (referring to the letter as the City staff's "initial review"), 11 (explaining that "Plaintiffs' 1983 Claims are based on the November 3, 2023 Letter and attached Comments, in which the City . . . rejected the application for the proposed development because it was incomplete), and 12 (arguing the Denial Letter shows that "the City only refused to allow drilling to occur on its own property").)  This briefing is consistent with the Denial Letter's text, which frames the Community Development Department staff comments as reflecting or consistent with the City's position.  (Denial Letter (prefacing the City's Saddle Mesa Comments with the statement that "the City[,] through its various departments and services, have now had the opportunity to review the development application for Saddle Mesa and have provided the attached comments"); Saddle Mesa Comments (informing the owners that the Denial Letter means "the City will not grant either access or indemnification for any work on City owned property.").)  On the facts alleged, the court finds that the Community Development Department was run by City staff, the Community Development Department applies the same review standards as the City Council and Planning Commission, and the Owners' Application will consequently not be approved by the City Counsel or Planning Commission absent the Community Development Department's sign-off.  As a result, this case is distinct from the circumstances of N. Mill St., LLC, where defendants could show on their motion to dismiss that the Aspen city department that would review the developer's unsubmitted development plans would apply different criteria than the department that had denied their rezoning application—meaning the two departments' decisions were not interrelated or contingent on one another.  6 F.4th at 1222–23, 1231–34.  The Denial Letter, though sent by the Community Development Department, represents the City's ultimate position on the Owners' Application.

In sum, because the Owners have established that their ability to complete the work associated with the geotechnical study is a threshold issue for development of any scope, requiring the Owners to amend their application on this or other issues before claiming a "taking" would be a futile process.  The Owners have established that they have prudential standing to challenge the City's final decision and survive judgment on the pleadings.

### B.    The City's Rejection of the Owners' Proposed Development Plans[9]

Because the Owners have prudential standing, the court next examines whether the Owners have adequately stated an "actionable Fifth Amendment takings claim" by showing the government has taken their Property, either through regulation limiting use or total physical disposal, "without paying for it."  Knick v. Twp. of Scott, Pa., 588 U.S. 180, 185 (2019) (citing U.S. Const. amend. V); see also Lucas v. S.C. Coastal Council, 505 U.S. 1003, 1016 (1992) ("[W]hile property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking."); Lingle v. Chevron U.S.A., Inc., 544 U.S. 528, 537 (2005) ("[G]overnment regulation of private property may, in some instances, be so onerous that its effect is tantamount to a direct appropriation or ouster . . . compensable under the Fifth Amendment.").  The Owners argue, in essence, that the City's regulation of hillside development and selective enforcement of the Hillside Ordinance have gone "too far," therefore constituting a taking.  (Compl. ¶¶ 20–21, 27–29.)  The City, by contrast, seeks to dismiss the Owners' Fifth Amendment takings claim by arguing that the Owners have no inherent right to use City land in furtherance of accessing, testing, or developing their privately held land, even if such use is

---

[9] Aside from its now-rejected prudential standing argument, the City does not dispute the adequacy of the Owners' equal protection and substantive due process claims.  Accordingly, the court examines only whether the Owners have adequately stated a takings claim warranting relief under the Fifth Amendment.

necessary to fulfill the regulatory requirements the City has imposed here.  (ECF No. 33 at 11–15.)

Typically, courts recognize regulatory takings where the government "invades" privately held land, either physically or through imposing regulations making it difficult to build or develop on the land.  But there is also a body of caselaw from the Court of Federal Claims recognizing regulatory takings where property owners are denied "feasible" or "reasonable" access to their land.  E.g., Grill v. United States, 154 Fed. Cl. 802, 814 (2021) (setting forth a "general rule that owners of property enjoy a right of reasonable access to their property") (citing Palmyra Pac. Seafoods, L.L.C. v. United States, 561 F.3d 1361, 1371 (Fed. Cir. 2009); McGuire v. United States, 97 Fed. Cl. 425, 439 (2011) (the government will be deemed to have gone too far where it "denies all feasible routes of access to a plaintiff's property").  Here, the Owners raise a somewhat novel regulatory takings issue, arguing that they cannot, because of City regulation, meaningfully access and thereby develop their own land without the ability to traverse and perform City-required testing and construction work on City-owned land.  The court agrees, finding the Owners have pled a "feasible access" regulatory claim in being denied the ability to work on city land just as if they were denied the ability to use any roadway access to their Property.

As an initial matter, the court highlights several relevant factual inferences adequately supported in the Complaint.  As the City does not dispute, the geotechnical testing the City has required the Owners to complete—whether performed on the Owners' land or the City land—cannot be done without enlarging the existing roadway.  (ECF No. 34-2.)  Similarly, the City has dictated that the existing access road cannot be enlarged without an indemnification agreement from the City, and that, even if the Owners were indemnified to drill or enlarge the road, any

enlargement project would be barred by the Hillside Ordinance.  (Id.)  Finally, accepting the Complaint's allegations as true, the City officials' guidance, combined with reasonable engineering analysis, require the Owners to drill on and test City land to complete the Owners' geotechnical survey of their own Property.  (Id.)

Even though the Owners technically have some way to gain access to their Property by using the existing roadway, the seven to twelve foot wide road is functionally insufficient to support underlined meaningful access.  In other words, if the Owners cannot take the steps needed to develop their land by using the existing road in its current state, then they cannot "feasibly" or "reasonably" access their land.  Similarly, as discussed above, the Owners cannot "feasibly" or "reasonably" develop their land without the ability to drill on City-owned land.  To hold otherwise, as the City urges, would lead to absurd results.  By the City's logic, it could let all roadways to undeveloped private land remain in a state of utter disrepair and refuse to permit private landowners to improve them.  Or the City could similarly refuse to build roads wide enough for the average car to pass through or sufficient to bear the weight of any reasonably sized construction vehicle.  Or the City could require that landowners seek government indemnification to enlarge the road at their own expense but refuse to grant indemnification without any good faith reason.  Or the City could require that landowners test the structural integrity of City property in order to do work on their own private property but unreasonably deny access.  Each of these scenarios would deny property owners reasonable access to their land as if they had no access roadway or ability to do construction on their own land to begin with. Because the Owners cannot access or build a development of any scope without the City's roadway construction approval, indemnification, and the ability to drill on City (as well as their own) land, the court can reasonably infer that the City has functionally "taken," by its regulation,

any potential economic benefit of the Property.  The Owners' takings claim therefore survives judgment on the pleadings.

On the other hand, the Owners have not adequately stated a takings claim based on the City's denial of their request for a secondary roadway passing through City land.[10]  The Owners argue that they are entitled to an easement in order to build a 168-unit development under the terms of the "Utilities Easement" on the Warranty Deed and/or because they City has purchased all the land surrounding their Property.  The court is not persuaded that the City's conduct regarding the secondary roadway constitutes a "taking," because the Warranty Deed's plain terms provide otherwise and the roadway decision does not actually deprive the Owners their right to profit from their land.

First and foremost, the Owners' Warranty Deed gives the Owners the right to just one public access roadway cutting through the adjacent land.  The Warranty Deed's Utilities Easement, by contrast, is plainly intended to apply for running services such as gas, electric, and water lines and providing the accompanying, incidental access for maintenance to those lines.  While the Owners' right to construct a utility line also implies their right to gain access to that utility line for maintenance purposes, this does not mean that the general public can use a utility line access road as a public entrance road to the Property.  In accordance with Utah contract interpretation principles, the court cannot, as the Owners urge, ignore the Warranty Deed's distinction between a Utility Easement and Roadway Easement.  E.g., Keith v. Mountain Resorts Dev., LLC, 337 P.3d 213, 220 (Utah 2014) ("Deeds are to be construed like other written

---

[10] Neither the Owners nor the court question the facial legitimacy of the dual entrance requirement for a development of this size.  See Penn Cent. Transp. Co. v. City of New York, 438 U.S. 104, 125 (1978) (collecting cases showing courts frequently uphold regulations that promote "health, safety, morals, or general welfare" even if those regulations "destroy[] or adversely affect[] recognized real property interests").

instruments."); Encon Utah, LLC v. Fluor Ames Kraemer, LLC, 210 P.3d 263, 269 (Utah 2009) ("In interpreting a contract, we look for a reading that harmonizes the provisions and avoids rendering any provision meaningless.").  Had the Owners sought to purchase the rights to two entrance roads, they should have contracted for a second Roadway Easement.

Nor are the Owners entitled to an easement for a second roadway because the City owns the surrounding land or because the Owners' most profitable economic use of the Property requires that they construct a housing development with 168 units and two roadways.  From the facts alleged, the court infers that the Owners and eventual inhabitants can still enter and exit the Property by way of a single Roadway Easement and that the Owners could resubmit a smaller development proposal with fewer homes, thereby requiring just one general access roadway to comply with the City's safety code.  See N. Mill St., LLC, 6 F.4th at 1230.  Alternatively, as the City suggested, the Owners' plans need not include a secondary access road to obtain City approval if they promise that all homes will be "equipped with an approved NFPA 13R sprinkler system."  (Saddle Mesa Comments at § D.)  The City is obligated to permit reasonable, economic use of the Owners' land, but it is not obligated to approve the specific "most profitable" development plan requested.  Andrus v. Allard, 444 U.S. 51, 66 (1979) (finding government regulation "prevent[ing] the most profitable use" of owner's property was not a regulatory taking).  Because this aspect of the City's denial of the Owners' Application would not strip all economic value from the Property, it cannot form the basis of a takings claim.

In sum, the court grants the City's motion against the Owners on the secondary roadway issue.  The Owners may proceed with their takings claim as it relates to their ability to conduct the geotechnical survey and enlarge the existing roadway.

### C.       Declaratory Judgment

Because the court finds Plaintiffs constitutional claims are "ripe" based on the City's

"final" decision to reject their Application, the court also rejects the City's argument that the

Owners' declaratory judgment claim is not yet ripe.

### D.       Supplemental Jurisdiction

Because the court finds Plaintiffs have adequately stated a claim under the Fifth and

Fourteenth Amendment claims, it will exercise supplemental jurisdiction over the Owners' state

law claims arising under the same facts.  E.g., Smith v. City of Enid, 149 F.3d 1151, 1156 (10th

Cir. 1998); 18 U.S.C. § 1367.

## ORDER

For these reasons, the court ORDERS as follows:

1.       The Defendant's Motion for Judgment on the Pleadings (ECF No. 33) is DENIED

IN PART and GRANTED IN PART.

DATED this 16th day of January 2025.

BY THE COURT:

*Tena Campbell*

TENA CAMPBELL
U.S. District Court Judge